May it please the Court. Your Honor, Matthew Connelly and with me today is Michael Schlanger on behalf of the Appellants Expo Properties and Merchants Properties. I believe the heart of this case comes down to two fundamental issues which I'd like to address. One has to do with the estoppel certificate, the nature of it, what it specifically says, and why it was both so important to the buyer at the time they purchased the property, as well as to sort of how the decision here is out of step with both Maryland law and third as well as nationwide law dealing with estoppel certificates. What controls? Is it Maryland law? It is Maryland law, Your Honor. Okay. What good is the nationwide law? It's because of estoppel certificates, Your Honor, and because estoppel certificates do not... We got the general aspect that we can figure out generally from a national perspective, but Maryland law controls this. We have an agreement on that, right? Yes, Your Honor. And the second point, Your Honor, that I want to address has to do with whether or not the tenant is required to make repairs or pay for them after the lease ended. And so turning to the estoppel certificates, at the time the certificate was signed in 2006, there was no doubt about what the lease meant or what it was. The tenant had been in the building for 12 years. Who is the one party? Of the certificate itself? Yes, that's correct. But the certificate is one part of the agreement signed at the time. Merchants Properties and John Laughlin, who was representing Expo at the time, signed the purchase and sale agreement of which the estoppel certificate was one part and an important part of the consideration. Maryland law requires mutual assent. Is that right? Yes, it does, Your Honor. It also requires this one party mutual assent. So the certificate itself was consideration for the deal. And it is the consideration and the mutual assent here is part of the entire agreement, including among the buyer, the seller, and the tenant. And so the estoppel certificate has to be viewed in the lens of the underlying agreement. And so in this case, the buyer assented to it when it signed the purchase and sale, essentially agreeing to the lease as the tenant interpreted it. And so like all estoppel certificates, the landlord or the prospective buyer never signs it. So the buyer somewhat stopped from denying the estoppel certificate? The tenant is stopped from denying the certificate, Your Honor. But he didn't sign it? Well, the buyer signed the purchase and sale agreement. But not the estoppel certificate? That's right, Your Honor. And so the buyer, when it enters into the purchase and sale, agrees to be the assignee on the lease under which it is interpreting the lease according to its terms. And so that is where the mutual assent part comes in. But this is like all estoppel certificates, Your Honors. It has to do with the third party consideration. No buyer signs an estoppel certificate at the time it's entered into. The consideration is third party. And as the court in Queens City... So are you using the estoppel certificate to assert a right? Yes. In other words, are you using it to assert a right and not as a defense? It could be both, Your Honor. Under Maryland law? Yes, Your Honor. I thought under Maryland law it could only be used as a defense. I could be wrong. I'm not set for Maryland law. You fall more for me than I am. I'll ask the other side about it. The case I'm relying on, Your Honor, is the Queen City Enterprises case from 1963. And that case is not an estoppel certificate case, but it is dealing with third party consideration. I'm just thinking of an estoppel certificate. When has it been used affirmatively to assert a right? There is no question. But this is not a defense. You are using it affirmatively to assert a right against a contract that arguably is unambiguous or ambiguous. If it's unambiguous, then it's against an unambiguous contract. Yes, we are using it to assert a right. I don't know that the tenant could potentially use it to assert a right since it's the only one signing the estoppel certificate, but that's not the issue that we have here. We have an issue here where the tenant signed the estoppel certificate and the landlord, as somebody who received the certificate as consideration for the purchase and sale, is using it to assert the right. But I'm just asking, where has there been a case where one has used an estoppel certificate to assert a right in order to recover it? Yes, Your Honor, the GE Capital case out of the Southern District of New York is the example that comes first to mind. GE Capital was basically the assignee on a lease and Domino's Pizza was the tenant. The tenant said in the estoppel certificate that it would remain in the lease and be liable for the rent. Soon after the agreement was signed, Domino's vacated the premises and denied that it owed the rent. So GE Capital was entitled to go into a court and force the estoppel certificate and require Domino's to pay the rent for it. It was about $350,000. Your Honor, getting to the point, this concept of third-party consideration not having to flow between necessarily the promisor and the promisee is in the Queen City's case. It is also in the restatement, second of contracts, which says it matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous. The court in HRC Guam said in 2017, every court to address estoppel certificates and the effect is held that such a certificate stops the signatory from asserting facts in future litigation that are contrary to the facts as set forth in the certificate. In this case, it is especially important because at the time that the buyer came into this building, it was not an expert on the lease. It did not have a fundamental day-to-day understanding of the course of performance or what the parties had agreed to. It had met with the then landlord and said, well, what are the terms and what have the parties agreed to? And the buyer and the merchants had heard that there was this May 1998 letter that the tenant was responsible for all costs and repairs. And so the buyer, rightfully, not wanting to just take the landlord's word for it, also wanted confirmation from the tenant. And that's why you have the estoppel certificate, which is broken down into sort of its three parts. First, it lists all of the documents that have been modified and amended the agreement. And that includes this May 1998 letter, which is so important, as well as seven other documents. And that includes both what you would consider to be formal documents that say amendment, as well as other things that you might not consider to be formal amendments, such as a letter in 1998, as well as a letter in 2003. The estoppel certificate... I guess I'm getting confused. The first question, of course, is whether this lease is ambiguous or not ambiguous. It appears to be quite clear that it has a cost-splitting provision in it. And those cost-splitting provisions are very specific. And if that's so, then it seems to me that your contention is that this estoppel certificate modifies the contract. Is that right? We have two positions, Your Honor. But is that part right? That you are saying that it in fact acts, I guess, as a contract to modify another contract? It is either a modification itself or it is confirmation of a modification that had occurred. But you wouldn't get confirmation of how it occurred. That's paroled evidence. If you find the contract itself is unambiguous. Yes. But one of the important parts of the estoppel certificate is it defines what the lease is. And here it is not just the original lease. It is the original lease, the May 1998 letter, and the four or seven or other documents that the tenant said were the lease. So it in fact became the lease? If it defines what the lease is, and it's only signed by one party, and then later on there's an assent to it that's not even part of the certificate, you say that changes the contract?  It is not the entire contract, Your Honor. But it becomes incorporated in the contract, so to speak? Yes, Your Honor. It is binding. That's correct. There's something a bit unjust about your position. At least it strikes me offhand. That is that you had the right during the term of the lease to go in and make repairs and then charge the cost of those repairs as additional rent. And you didn't do that during the term of the lease. And the lease expired, and all of a sudden you wanted to make extensive repairs, and you wanted experience to contribute to the cost of making those repairs, despite the fact that you had overlooked a remedy that was available to you during the term of the lease. And after the lease you wanted them to pay for something from which they could enjoy no conceivable benefit because they vacated the premises. And I think that struck the district court as a little as wrong and as something that couldn't be salvaged by the estoppel certificate. But I realize this is a contractual problem and that equity would take a back seat, but just as a matter of contract you had a right to charge them additional rent during the term of the lease. You had a right to go into the premises to see what was needed. Now you wanted to pay for something for which the tenant cannot benefit in any conceivable way. And that just strikes me as something you need to explain. Yes, Your Honor, I'll turn to that. The issue that this goes to the heart of this is what was the condition of the building supposed to be in at the time the tenant brought it back. Yes, Expo Properties had the right to come in and do the repairs itself, but it did not have the obligation. Under the lease it was the tenant's responsibility to make all necessary repairs during the lease. But you can waive rights. You say you only had the right but not the obligation. That doesn't mean you can't waive rights. That's right, Your Honor. But the section that the district court cited, Section 8, said clearly that the landlord is under no obligation to make repairs during the lease term. And then it goes on in Article 24 that says after the lease expires, the landlord can go into the premises and expect it. And if the condition is not the condition it was supposed to be returned in, then the landlord has the right to make the repairs itself and charge that to the tenant. And I would say, Your Honor, that this is... That's for ordinary maintenance. It's not for major structural upgrades. It is both, Your Honor. Our Section 8 made it the tenant's responsibility. Don't strike me that way. It struck me that for ordinary maintenance that things might be as you say, but if you wanted a major structural upgrade, that seems to be something different. Your Honor, it was a 30-year lease. And the tenant was supposed to return the building in the same good order as it was received. And this goes to the Schultz brothers' case, too. That comes out of the Northern District of Illinois with Judge St. Eve. It was required to be returned in the same good order. If you wanted to put in a whole new air conditioning system, that goes above and beyond returning something in the condition in which they found it. That goes to a jump off. That's an upgrade. That's just not a tenant returning something in the condition that they found it. It's not something that's just ordinary wear and tear. It's a structural upgrade after the term of the lease for which they'll be in charge and for which they have no benefit whatsoever. That's what troubles me. Yes. Your Honor, the way I would think about it is that the tenant got the benefit of the last one, and it got the benefit of the last roof. And you were correct that normally a tenant is not responsible for structural repairs, but that can be contractually changed. And in this case, Section 8 clearly makes the tenant responsible for that. But you see, this is the thing. With a structural repair, the landlord continues to realize the benefit of that structural repair year upon year upon year. You get a benefit in the fact that you can charge future additional tenants a whole lot more rent by virtue of that air conditioning system and the like. And whereas you can charge rent that goes solely to you and you are solely to your benefit, you expect these folks to pay for something that has no benefit of them at all. And that just strikes me as one-sided. It strikes me as very one-sided, all for you and nothing for them. Your Honor, they do get a benefit. They got a lower rent payment throughout the term of the lease because they were the ones who were responsible to bring the building back up to its condition at the end of it. So they do get a benefit, and it's a pretty sizable one. But in answering Judge Vogel's questions, you rely upon Article 8. Article 8, where does it say what you say it says? It seems to say very specifically this is for repairs during the term of the lease and that the landlord can enter this property, does have a right to come in there and make those repairs during the term of the lease. And as a result of that, those costs can be taken out from the rent. And then it goes on to give the exceptions, and then part of the exceptions include this cost-splitting, very specific language that encompasses what Judge Wilkerson is talking about. You leave and then you split the cost with the tenant and the landlord. What's ambiguous about that? There's nothing ambiguous about the first provisions, right, which says that the tenant must make all necessary repairs to the roof and to the exterior. During the term of the lease. That's right. And then it says there's nothing ambiguous about the landlord can go in and do it himself. That he has the right but not the obligation. He has the right to come in there. It says here you can come on to the property, you can enter and make reasonable structural repairs as he deems necessary or proper. So there's nothing ambiguous about that. That's right. And that if he does, nothing ambiguous that it can be borne by the tenant as additional rent. Your problem is, okay, you get into the Judge Wilkerson land where you've gotten all that benefit, where there's a reasonable tenant's done it because the tenant's using it the whole bit. Now you've got a provision that specifically says it will be split one-half to the tenant, one-half to the landlord. What's ambiguous about that? By itself? Well, I don't know about the by itself. This is the contract. I don't know if anything else needs to become here. All the other provisions you put in there has an except for here and after. And this is an except for here and after provision. Yes. And, Your Honor, but when you get to Article 24, when you talk about sort of the condition the building needs to be returned in, there's no cost-sharing provision among the restoration obligations. And so that does create an ambiguity, which was resolved by the May 1998 letter and which was resolved by the ESOPL certificate. If you view it as an ambiguity, but if it is specific as Article 8, it doesn't look ambiguous. It looks like it says what it says. As to the cost-sharing provisions, I understand that looking at it just by itself, and that is why the May 1998 letter, the ESOPL certificate, and the course of performance is so important. Well, that's parole evidence. You don't need that if it's not ambiguous, if it's not unambiguous. It may be used if it's not ambiguous or is evidence of a modification, Your Honor. So the modification business goes back to my question, which under Maryland law you need mutual assent to. And in order to prevail there, you're going to have to say, well, that one signature on the certificate was not just the end of it. It was the fact that there's a later action here that one can say effectively acted as a signature on that ESOPL certificate. That's what you're saying, right? That's in part, yes. The mutual assent. Has anybody ever said that other than you in a court? That the mutual assent doesn't require the two signatures? I mean, is it an assertion? A mutual assent doesn't require mutuality. No, mutual assent, I agree, it does require mutuality, Your Honor. That's what I'm asking in terms of a certificate. That's what I'm asking. Has any court ever said what you say that would be the way it would operate? What I would say is that the mutuality comes in as part of the total transaction. It's not just the ESOPL certificate. It is the underlying purchase and sale agreement. And all courts that have analyzed ESOPL certificates have said that's enough. In Maryland? And elsewhere, yes. Thank you. Ms. Fong. Thank you, Your Honor. May it please the Court. This lease was not a 20-year lease. In March of 1994, the tenant entered into a five-year lease. And when you read the original lease and you look at Article 8 regarding structural repairs and maintenance, not structural replacements, but repair and maintenance, the third sentence plainly includes a cost-sharing mechanism. That provision in and of itself is not ambiguous. You cannot read the cost-sharing provision and think to yourself, a reasonable person would not think to themselves, oh, this means the tenant pays for everything. He didn't say it's ambiguous. He says by itself, no, it's not ambiguous. The problem is Article 24. He says at the end of it, then you are to leave it in certain conditions and stuff. And so that creates ambiguity. How does that create an ambiguity, Your Honor? And that's rhetorical, of course. Article 24 is the article regarding the surrendering. How do you surrender it? You surrender it in its original good condition, ordinary where accepted. The roof, now there's a five-year lease. It was renewed three more times, I believe. So, yes, you are at the end. But a roof wears, as it does everything. This is not a case like some of those cited by the appellants where the tenant did nothing. There is replete in the record of hundreds of thousands of dollars of repair, including repairs to the roof. Well, Judge Wilkerson imposed that this could have been done during the term of the lease, which I tend to agree. But the problem is it wasn't done during the term of the lease. Is that a problem? I mean, could the landlord have gone in and done these things and taken off the rent during the term of the lease? Yes, Your Honor, absolutely. And I want to address why the lease was written that way. Again, Your Honor, this is a five-year lease. Each option was five years. Actually, the first initial one was supposed to be five years. It ended up being four because the landlord chose to expand. But regardless, on a five-year lease, you're talking a million dollars of repairs is what they're asking for now, a million dollars. What tenant has a million dollars after paying $50,000 in rent to put it out of pocket? If you review Article 8 regarding how payment is made, if you review Article 4 regarding how capital improvements are made, I believe Judge Wilkerson, in speaking of these massive structural repairs, replacements, that's what you're talking about. What's a capital improvement? You amortize it over time. Who pays for it? The landlord pays for it because he has been collecting rent as you go. So a capital improvement is made by the landlord. And then the landlord takes however much he paid, a million dollars. And that's what the tenant paid for because the rent goes up and then he uses the money to pay for it is what you mean. Yes, Your Honor. I got you. Yes, Your Honor. But actually, Your Honor, the landlord does pay for it because somebody is paying the contractor. The contractor is not waiting during the term of the lease to get payment month by month. The landlord replaces it and then charges that amount over time. As additional rent. And that's why Articles 4, Articles 8, all talk about during the term of the lease, charged as additional rent. Article 4 requires additional rent to be made throughout the term of the lease. It requires additional rent to be cost that is paid or incurred by the landlord or on its behalf and billed to the tenant. You don't have any of that. There was nothing cost incurred. There was nothing paid by the landlord. The landlord didn't make any improvements. And then they want to talk about, well, this is a capital improvement. Capital improvement under Article 4D3 requires the capital improvement to be made during the lease term. When a cost is more than $5,000 alone or $10,000 in the aggregate, you have to have prior written consent of the tenant. There is no evidence that there was any prior written consent given by the tenant. None was even asked by the tenant. Asked of the tenant, I should say. If I may address the ambiguity, does something else make the lease ambiguous, make the cost sharing provision, make the additional rent provision ambiguous? I submit, Your Honor, that it does not. The estoppel certificate itself does not address the Article 8 cost sharing provision. So if it doesn't address the cost sharing provision, it does not say that it has been deleted or eliminated. How could it possibly have changed the lease to get rid of an entire provision of Article 8? Then, counsel addressed the May 1998 letter. But, Your Honor, if you look at the May 1998 letter, which is at Joint Appendix 377, it doesn't mention Article 8. So how could a letter, a letter not signed by both parties, only signed by the man, from 1998, that doesn't address Article 8, presume to create an ambiguity and then change the lease? Again, I submit that it does not. Does the letter evidence a mutual assent of the estoppel certificate? Absolutely not, Your Honor. Estoppel was a certificate signed by one party. Yes. And the opponent here intends there's a later action here in the letter that gives the assent necessary under Maryland law to have an estoppel certificate. Actually, the letter predates the estoppel certificate. The letters from 1998 give estoppel certificate, I believe, in 2006. The letter is signed by the landlord addressing some payments that the landlord is making and references a conversation the landlord had with the tenant. The tenant does not acknowledge or sign the letter. I believe the district court in Putnam mentioned that the May 1998 letter fell in terms of not having a mutual assent bargain for consideration as well as the estoppel certificate having the same flaws. Therefore, if you look at the only documents Expo has addressed, there is nothing in there to get rid of the cost-sharing provision. There is nothing in there to get rid of the landlord's obligation. If it wanted to get its roof paid for, to do the repair and charge it over time as additional rent. There is nothing in this lease that allows the landlord to do what it did, which is sit on its laurels and wait for literally a month before the tenant is going to move out to then hit them with a requirement to expend a million dollars right before they left. If the landlord, and the landlord had the opportunity under the lease to go in whenever it wanted and do whatever it wanted, as long as it was reasonable, and charge the tenant. It did not take any of those provisions. It did not take any of those requirements under the lease. It simply waited until the tenant was ready to leave. So the estoppel certificate, I know it's been used as a defense in a breach of contract, and a defense in constructive eviction. Can it be used affirmatively to assert a cause of action? I do not believe it can be used to affirmatively assert a cause of action. Or a breach of contract. Or a breach of contract. Because the estoppel certificate is being asserted by what is the purchaser, merchant. It's not even expo properties, it's merchant. And so how can it be used to assert a breach of contract when they are not a party to the contract? And even if it could be used as a theoretical matter, if you look at the estoppel certificate, what are they trying to enforce against the tenant? They are trying to enforce a non-existent provision. They are trying to say that the estoppel certificate and or the May 98 letter eliminated the cost sharing provision of our claim. Where does it say that in the estoppel certificate? It does not. The cases, there are not many, and both parties, as I was reading through our briefs, realized that we cited a whole lot of cases, none of which address this issue because there is no case where a landlord or a purchaser of a landlord has tried to use the estoppel certificate in this manner, which is to eliminate an unambiguous phrase of a lease. Upon the site of the New York case, what it says does that. In that case, your honor, that, number one, the New York law does not address, and is not the same as the Maryland law. There is no Maryland law that allows the estoppel certificate, that says an estoppel certificate can be used to assert a claim against a former tenant. Number two, that case was, there was no bargain for consideration addressed. None of the issues that this district court addressed are contained in that case. And, as your honor can see, given this plethora of cases on estoppel certificate, each estoppel certificate is different. Each lease is different. What did the tenant give in order to receive something from the appellants? Nothing. What was the purpose then? What did the tenant get out of this? The tenant got nothing out of it, your honor. Why didn't they sign it then? Because he's required to do so under the lease, your honor. So you're saying it's duress? It is not duress, your honor. So it's a contractual obligation to sign this document? Yes, your honor. So what's in the document, then, wouldn't it be a part of the contract, if under the contract they're required to sign it? No, your honor. So Maryland law does not state that the estoppel certificate becomes part of the contract. The estoppel certificate, as it is normally used, is a document that confirms what someone can read or confirms events that are not in the lease itself, such as leases often talk about rent. Is it $5,000? Is it $7,000? Did the landlord and tenant come to some understanding that the tenant's going to pay a little bit less because there was some interruption of business? That is not something that is in the lease. That does not contradict material terms and language of the lease. It does not seek to eliminate material terms of the lease. That's what is being used for here. An estoppel certificate... But it seeks, then, to clarify what was agreed to but is not in writing? Sometimes, your honor. What is this? We're talking about here. What was the purpose of it? The purpose of the estoppel certificate here, I believe... From the tenant's perspective. From the tenant's perspective. Yes, your client. Yes. What were they trying to gain from this? The tenant was not... You said because they were required to sign. We were required to sign it, your honor. So that means they agreed to everything that's in here. We agreed to what is in the estoppel certificate. If you look at the estoppel certificate, it talks about there's no default under the lease. That is a typical... I agree with that. People want to make sure there are no defaults. Okay. There are other... My question is this. People talk about a lot of just common sense. If you know that the agreement clearly, as your position is today, says you split costs, why would you sign this document that at least raises some questions as to whether or not you have to pay all of it? Your honor, there is no... Number one, the estoppel certificate includes the lease with it. You cannot read the estoppel certificate alone. If I take your question to the absurd end, what that would mean is the estoppel certificate is what rules, and you can just ignore all of the other clauses of the lease. It might if you write it the wrong way. Yes, your honor. Maybe you wrote it the wrong way. My question is why would you sign... For example, if I know that I have a contract that clearly, unambiguously says that we have to split these costs, why would I sign a document that says... You can almost quote from it. It says that the tenant is responsible for all of these things. Why would you do that? Why, your honor? Because the... I was a litigator. I wasn't a transactional lawyer, but it seems to me that it doesn't make any sense. Your honor, because all this is doing, it is adopting one sentence of Article 8. The tenant did not think that by adopting, by quoting one sentence of Article 8, that the rest of Article 8 was going to be deleted because if that were the case, it would say the rest of Article 8 is hereby deleted. But after it made that quote, and you're right, it is partial, but it ends up being rather broad as to... The tenant acknowledges that all repairs of the building, premises, building are part of the responsibility of the tenant, including capital improvements provided that such capital improvements are subject to the prior written consent of the tenant. Well, that seems pretty broad. You're responsible for everything. Your honor, that is just as broad as the first sentence of Article 8 is. That's just as broad as the provisions of Article 4 is, except that the lease includes other provisions that address specifically the cost hearing. If we stop the certificate under Maryland law, under law of general contracts, if you are intending to assert a change, it must be clear. Is it clear that the parties intended for any phrase not stated in these four pages of the estoppel certificate are deleted? No, it's not. But there are statements that are clearly in tension with the cost splitting provision. It says, I'm going to read it again, but it says you acknowledge that you're responsible for, it says, all and including capital. In other words, there's an old saying that law can't do for you what you won't do for yourself. You signed it, but now you say, oh, this doesn't mean anything. The contract is clear as day. Why would you sign something that introduces anything but clarity to this contract? Because, Your Honor, this estoppel certificate, by incorporating the entirety of the lease, by stating that the lease is in full course of effect, by attaching a copy of the lease to it as an A, it means you read the entire lease. The case law does not allow a party to, by omission, change the lease. That is the Pocatelli case. In terms of parole evidence, it may not vary the terms of the lease. Parole evidence in Maryland, unlike some jurisdictions, is very clear. You may not use any parole evidence to vary, to change, or contradict the terms of the lease. If this estoppel certificate were intended to delete the cost-sharing provision, what the court is essentially doing would be, or what the district court essentially would do, is to change the terms of the lease where the parties have not mutually agreed and there is no bargain for consideration, which is why the district court went down the route of looking for What did the tenant get out of this? The tenant got nothing out of it. Why am I giving up a 50% cost-sharing if I'm not getting anything out of it? I wouldn't. But this estoppel certificate doesn't say that the cost-sharing provision is eliminated. It does not say that Article 8 is being modified or amended. The 1998 letter does not say so either. And, therefore, the district court properly analyzed the estoppel certificate under normal contract principles. Was there mutual dissent? No. Was there bargain for consideration? No. Why did the tenant sign it? Because the lease required them to sign it. So then your position would mean that we have to find that this whole certificate of estoppel is a nullity. No, Your Honor. Well, you can't pick and choose it. You just said, well, this doesn't govern the contract. It doesn't mean anything. You went down the lines of the normal first-year law school contract and all those things that are required for formation purposes. So then aren't you arguing that the whole estoppel certificate is a nullity? Your Honor. I'm asking that question. Aren't you arguing in effect that the whole estoppel certificate is a nullity based on what you just told me? No, Your Honor. Well, okay. I thought you ticked off the things that made sure there's no formation. Your Honor, because you read it in the context of the lease. You read all of this in the context of the lease. I'm trying to do that. But the context to me, in common sense, when you introduced this, why wouldn't you sign this? And you keep saying the answer is we were forced to. We were forced to. We signed it because it correctly says at that time there was no default by the landlords that we were aware of. All right. It accurately stated what the rent was. It accurately stated when the lease expired. It accurately stated that we had an option to extend. It accurately stated that part of Article 8, the part it cites, is an accurate quote. What it does not say is we did not promise, we did not represent, we did not waive the cost sharing provision. We did not waive, and the landlord did not waive, any of the other myriad provisions. Do you agree that acknowledging something is the same thing as waiving something? You acknowledge it. You assert that you acknowledge that. The tenant acknowledges. Then it goes on. All of these things are responsible. The tenant acknowledges that the statements of fact are statements of fact. They exist. You're cherry-picking this document. You went down like it does. As to default, it was right. It was right to that. But you get to Paragraph 8. Ah, not that one, Judge. That's the one where we fell asleep. We had to do that, but it really didn't mean what it says. I don't see how you cherry-pick something that you sign and say that everything else except for the part. It's as clear as day. It's English. Your Honor, I'm not trying to cherry-pick. I'm saying that as far as it goes in the Estoppel Certificate, we agree. As a general principle, the tenant does pay for repair and maintenance, but that's not all of it. You then go to the lease to say, well, what else are there? What are the default provisions? What are the Estoppel requirements? What are the surrender requirements? What are the additional rent requirements? What are the cost savings? I see. You're trying to convince me that all doesn't mean all. Go ahead, Counsel. I took some of your time, so if you want to take a minute or so, too. Your Honor, I would like to close with this. In terms of the Estoppel Certificate, you cannot read it on its own. You must read it in the context of the lease itself. Therefore, if you read the Estoppel Certificate and the lease provisions and read it the way Maryland requires, which is you look at all of the provisions, and if you perceive any ambiguity, you try to read them harmoniously so you don't get rid of nullified language that the parties wrote in the original lease. Only by nullifying the cost-sharing provision and actually the rest of Article 8 could you interpret this as the appellants want. Under Maryland law, the district court properly read the Estoppel Certificate and the lease provisions harmoniously and found that the cost-sharing provision remained and that should the landlord have wanted to make tenant pay for a roof that was going to last longer than the tenant was going to be there, it had to do it during the term of the lease. Thank you, Your Honors. Thank you, Counsel. Mr. Conley, you have some time reserved. Thank you, Your Honors. There's nothing new or novel about the Estoppel Certificate. In Section 8, which we spend a lot of time talking about, as well as Section 10, it says tenant is responsible for all costs and expenses of the lease premises. That is merely confirmation of what has been happening for the entire 20-year period of the lease, whether the tenant was originally Galaxy, whether the tenant was Experient, or whether it was Experient as owned by Merits. There are numerous records in the document, including an 87-page ledger showing that the tenant paid $2 million over the course of this lease for various repairs. At all points, either at the beginning or the middle or the end, there was never any cost sharing. That was the agreement, as confirmed in the Estoppel Certificate. But it's not new. It's not as if the Estoppel Certificate is a change in the ways that the parties had operated. With the cost sharing provision, you have something that was very specific and that the parties spent a good deal of time negotiating in everything specific language. Normally, the specific trumps the general. And if the cost sharing provision was going to be nullified by the Estoppel Certificate or some other thing, wouldn't you, and you have this very specific language, wouldn't you expect equally specific language that was going to amend the cost sharing provision right out of the contract? Your Honor, what the Estoppel Certificate says is that those cost sharing provisions in Article 8 were modified by the May 1998 letter. And then it goes on to say how. I believe that's sufficient in this circumstance, especially as confirmed by how the parties operated, both at the beginning, the middle, and the end. There were repairs that were less than $5,000, more than $5,000. There's some evidence of repairs in $20,000 or $60,000. And all of them, the tenant paid for it. Because the Estoppel Certificate doesn't change the deal. It is the deal. It shows and confirms the course of performance from the beginning and it's from the lens that the tenant agreed to it.  And then talking about other provisions of the Estoppel Certificate. No question about these two. I want to just briefly address this idea of the Estoppel Certificate being a binding contract. It is binding both as a matter of contract Estoppel and promissory Estoppel as part of the context of the purchase and sale agreement, as well as Article 26, which says that the Estoppel Certificate is given conclusive effect. So it might be the case that the tenant had to sign an Estoppel Certificate when requested. It was under no obligation to sign this one. Yeah, I found it interesting that you had to sign this particular document. Go ahead. It didn't have to. It could have said, I don't agree with this provision. I have questions about this. This doesn't seem to reflect it. But there was nothing of that sort, Your Honor. There was no question or confirmation. That part was signed with little thought or care, because that's exactly what the parties had done. And, Your Honor, Judge Wolfensohn, going to your point about sort of the harms that incurred here, the Estoppel Certificate set the expectations for the purchaser as to what it was going to need to do to the building when the lease expired eventually. And it affected the purchase price. It affected whether he was going to maintain any sort of reserve and how future negotiations were to be. So under the lease, at the end, the building was supposed to be put back. And that was the understanding of both the tenant and the then-landlord, as well as the buyer, once the Estoppel Certificate was signed. Had the landlord or the buyer thought he was going to be responsible for those major costs, he would have negotiated a different purchase price. And on this last point about additional rent hereunder, this is a net lease. And so there are two ways that costs get incurred. One is as base rent, and then everything else comes in as additional rent hereunder. Just because the tenant doesn't pay it during the term doesn't mean it's not also due. So, for example, there's an attorney's fees provision in the lease that is also described as additional rent hereunder. Surely a litigation that continues beyond the lease term, as in this case, the tenant would still be responsible for it, even though it says additional rent hereunder. And so, as the Schultz Brothers case says, the idea of additional rent hereunder doesn't mean that the obligation ends at the end of the lease. It merely reflects how it's to be accounted for and how it's reflected to be paid. Thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. We're going to come to our brief counsel, and then we will go to our next case.
judges: Roger L. Gregory, J. Harvie Wilkinson III, James A. Wynn Jr.